**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                          :          **FOR PUBLICATION**
                                               :
**THE FIRST UNION BAPTIST CHURCH OF**          :          **Chapter 11**
**THE BRONX,**                                 :
                                               :          **Case No. 12-14099 (MEW)**
                                   Debtor.      :
-----------------------------------------------------------------x
**THE FIRST UNION BAPTIST CHURCH OF**          :
**THE BRONX,**                                 :
                                               :
                               Plaintiff,       :
                                               :
                          v.                   :          **Adv. Proc. 16-01065 (MEW)**
                                               :
**TD CAPITAL GROUP LLC and 2064 GRAND**        :
**CONCOURSE LLC,**                             :
                                               :
                              Defendants.       :
-----------------------------------------------------------------x

<u>**MEMORANDUM OPINION**</u>

A P P E A R A N C E S:

KASOWITZ BENSON TORRES LLP.
New York, New York
*Co-Counsel for First Union Baptist Church of the Bronx*
   By:  David J. Abrams
         Andrew H. Elkin
         Isaac S. Sasson
         Emily L. Kuznick
         Andrew R. Kurland

THE LEGAL AID SOCIETY
New York, New York
*Co-Counsel for First Union Baptist Church of the Bronx*
   By:  Seymour James
         Susan H. Chase

RAVERT PLLC
New York, New York
*Co-Counsel for Defendants*
   By:  Gary O. Ravert

LAW OFFICES OF LALEH HAWA
Great Neck, New York
*Co-Counsel for Defendants*
   By:  Laleh Hawa

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

The First Union Baptist Church of the Bronx ("**First Union**") is a New York not-for-profit religious corporation.  First Union is the plaintiff in the above-captioned adversary proceeding and is the moving party in a motion that is described below.  TD Capital Group LLC ("**TD Capital**") and 2064 Grand Concourse LLC ("**2064 Grand Concourse**") are New York limited liability companies who are defendants in the adversary proceeding and who are the opposing parties to the pending motion.  2064 Grand Concourse is wholly owned by TD Capital.

This opinion follows a trial that was held on April 24 and 25, 2017.  The witnesses included Doctor James Wilson (Reverend and Senior Pastor of First Union), Nancy Bokhour (manager of TD Capital and 2064 Grand Concourse), Robert Smith (former financial advisor to First Union) and Thomas Campbell (managing member of Thorobird Companies LLC).  The Court has considered the stipulated facts, the testimony and exhibits offered at trial, and the credibility of the witnesses in making the factual findings set forth in this opinion.

**Jurisdiction and Ability to Render Final Decisions**

The parties have agreed that this Court has subject matter jurisdiction over this adversary proceeding and the motion, and personal jurisdiction over the parties.  The parties have also consented to the entry of a final decision and judgment by the Court.  It is not necessary to consider whether the Court would have had the authority to enter a final judgment without that consent, as the consent provides the necessary authority.  *See* 28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1939, 1942, 1949 (2015).

**Background**

First Union filed a chapter 11 bankruptcy petition on October 1, 2012.  At that time First

Union was a defendant in a foreclosure action that related to property that First Union owned at

2064 Grand Concourse in the Bronx (the "**Property**").  A judgment of foreclosure had been

entered on July 17, 2012, and a foreclosure sale had been scheduled for October 1, 2012.

However, the bankruptcy filing stayed further actions in the foreclosure case.

The plaintiff in the state court foreclosure case was Carver Federal Savings Bank, which

had originally made the underlying mortgage loan to First Union.  At some time after October

2012, and during the course of the bankruptcy case, Carver assigned its rights to TD Capital.

First Union and TD Capital subsequently reached an agreement that was memorialized in

a stipulation executed on or about May 16, 2014 (the "**Stipulation**").  *See* DX 4.  The Stipulation

provided that First Union would continue to own the Property and would continue to have the

right to refinance or to sell the Property until the end of June 2015, at which time a payment of

$1.5 million would be due (unless that amount had been paid earlier).  The parties also agreed

that First Union would continue to make monthly payments to TD Capital.  The monthly

payments were described as 'use and occupancy' payments in the Stipulation, but the evidence at

trial made clear that in form and function they were revised interest payments on the debt.

Monthly payments were due at the beginning of each month.  Paragraph 6(d) of the

Stipulation gave First Union a ten day "grace period" within which to make payment, and

paragraph 6(e) provided that payment could be made after the expiration of the grace period, so

long as it was received on or before the last day of the month and also included a late payment

charge.  Paragraph 6(f) stated that First Union would be considered to be in default if any

monthly payment was not "received" by TD Capital "by the last day of the month at 3:00 pm."

3

A missed payment had different consequences, depending on when the missed payment occurred.  The Stipulation provided that if First Union failed to make a payment that was due during the first 180 days after the agreement took effect, then TD Capital would have the right to pursue a sale of the Property under the prior foreclosure judgment.  First Union waived defenses to such a foreclosure sale, but it retained its right of redemption with respect to the Property and the right to exercise that right of redemption at any time before the conclusion of a sale.  However, the Stipulation provided for a different potential consequence if a default occurred more than 180 days after the Stipulation took effect.  First Union agreed to deliver a deed that purported to transfer the Property to TD Capital and that would be held in escrow; if a payment default occurred more than 180 days after the agreement became effective, then TD Capital had the option either to proceed with its foreclosure and sale remedies, or (if it so chose) simply to record the deed and thereby transfer ownership to itself.

Rule 9019 of the Federal Rules of Bankruptcy Procedure requires debtors to obtain permission from the court to enter into settlements.  Fed. R. Bankr. P. 9019.  Section 363 of the Bankruptcy Code similarly requires court permission for any use of property outside the normal course of business.  11 U.S.C. § 363.  First Union sought court approval, and Judge Gropper authorized First Union to enter into the Stipulation on June 27, 2014.

In the months that followed the execution of the Stipulation, First Union made the payments that were required of it, though it often did so only within the "grace" periods or "late payment" periods to which the parties had agreed.  DX 43.  First Union did not sell the Property and did not refinance it.  However, the evidence at trial showed that an entity named Thorobird Companies, LLC ("**Thorobird**") expressed interest in the Property and interest in helping First Union to satisfy the obligations owed to TD Capital.  The parties have stipulated that Thorobird

4

and First Union entered into a Development Agreement on May 31, 2015.  PX 6.  The

Development Agreement contemplated that Thorobird would advance the monies to repay the

debt owed to TD Capital, and then would redevelop the Property.  The redeveloped site was to

include space for the First Union Church plus 50 apartment units.  First Union was to own the

Church space in exchange for only a nominal payment; Thorobird, in return, would have the

right to develop the Property and to receive the profits associated with the apartment units.  *Id.*

At trial, there was some contention by TD Capital that Thorobird's plans were not

realistic or that funding was not actually available.  The Court has considered the evidence that

was offered, including the testimony of Mr. Campbell of Thorobird.  The Court finds that the

proposal was a serious one, and that the developer had sufficient capital to make the

contemplated payment to TD Capital and to complete the project.  No credible evidence was

offered as to any other issue that might have blocked the development plans.

The parties have stipulated that First Union informed TD Capital of Thorobird's interest

and authorized TD Capital's representatives to speak with representatives of Thorobird in May

2015.  They have also stipulated that two representatives of Thorobird attempted to reach Ms.

Bokhour, the representative of TD Capital.  It is not clear exactly how much Ms. Bokhour knew

about the agreement with Thorobird, and there is no evidence that she knew the full details of the

arrangements that First Union and Thorobird had discussed.  However, the evidence showed, and

the Court so finds, that she knew of Thorobird's interest in the project.

The evidence also showed that as of May 31, 2015 the remaining amount owed to TD

Capital consisted of the payoff that would have been due June 30, 2015 (in the amount of $1.5

million), plus the May monthly payment ($9,360), the June monthly payment ($9,360), and a

small late charge for the May payment.  The Court finds that Mr. Campbell testified credibly

when he stated that in light of the development opportunities, and the interest expressed by

Thorobird itself, the Property had a value, in May and June 2015, that was well in excess of the

remaining amount owed to TD Capital.

### Events in May and June 2015

First Union made payments to TD Capital from First Union's operating account.  At least

two authorized signatures were required on any check above $500 in amount.  The monthly

payment for May 2015, in the amount of $9,360, was due on May 1, 2015.  The payment was not

made on or before May 1, 2015 and was not made within the ten-day grace period.

At some point in mid-May, Dr. Wilson learned that his nephew had died.  He was

understandably upset by this news and made plans to drive to South Carolina to attend the

funeral and to be with his family.  On May 18 or 19, 2015, Dr. Wilson traveled to South

Carolina.  He did not make arrangements, before he left, to have a check sent to TD Capital.  Dr.

Wilson testified that between the time he learned of the need to go to South Carolina, and the

time he began that trip, he was unable to arrange the dual signatures required on such a check.

When asked why he did not sign a check himself, and leave the check behind so that an

additional signature could be added, Dr. Wilson testified that he did not think of it, and that

instead his thoughts were focused entirely on his nephew and his family.

Dr. Wilson made the trip to South Carolina with the plan to execute and send a check for

the May monthly payment to TD Capital upon his return.  The evidence showed that Ms.

Bokhour of TD Capital called Dr. Wilson while he was in South Carolina to check on the status

of the payment.  DX 42.  The evidence was not conclusive as to how Dr. Wilson responded to

her call, but he acknowledged in his testimony that he was aware as of May 21 that the payment

had not yet been received by TD Capital.

It turned out that Dr. Wilson spent more time in South Carolina than he had originally

expected.  He did not leave South Carolina until approximately May 28.  He stopped at his

sister's home in Maryland before making the remaining drive to his home in New York State.

He did not arrive at his home until May 29, 2015 at about 9:00 pm.

On Saturday, May 30, Dr. Wilson went to the Church premises and added his signature to

the necessary check to make payment to TD Capital.  He gave the check to his assistant and told

her to mail it.  Dr. Wilson's assistant did not testify.  A copy of the envelope that was sent to TD

Capital is in evidence, and it bears a postmark dated June 1, 2015.  PX 7.  The evidence is

unclear as to whether the check was sent on June 1, or whether the June 1 postmark is a result of

the check having been deposited in a mail box "after hours" on an earlier date.

On Monday, June 1, 2015, Dr. Wilson left a voice mail message with Ms. Bokhour,

informing her that the check had been sent and that it should arrive that day.  At that time Dr.

Wilson was under the belief that the check had been mailed on May 30.  Ms. Bokhour left a

message for Dr. Wilson stating that she had not received the check, but confirming that she

would extend the time for receipt of the check through the end of the day on June 2.  However,

the check did not arrive on June 2.  The parties have stipulated that the check sent by First Union

did not arrive at TD Capital until June 3, 2015.  (There were times during the trial when it

appeared that First Union was taking the position that the check may have arrived earlier, but the

parties stipulated to the contrary, and First Union's counsel acknowledged in response to

questions that First Union does not contend that the check actually arrived before June 3.)

The evidence also showed that on June 2, 2015, Ms. Bokhour sent the deed (which had

been held in escrow) to a title company for filing.  The parties have stipulated that "on June 2,

2015, after the close of business," Ms. Bokhour authorized the title company to proceed with the filing of the deed, and that the deed was actually recorded on June 8, 2015.

## Claims Asserted by First Union

The complaint in the adversary proceeding sets forth four claims. Count I contends that under New York law First Union retained a right of redemption that could not be extinguished except through the completion of a foreclosure sale, and that the provisions of the Stipulation that permitted TD Capital to record the deed and to transfer title to the Property without a foreclosure sale were void and unenforceable as a matter of New York law. First Union therefore seeks a declaratory judgment that the purported transfer of the title to the Property is null and void and that the Property still belongs to First Union.

Count II alleges that the provisions of the Stipulation that granted First Union the choice of either proceeding with a foreclosure sale or recording the deed and taking ownership of the Property operated as an impermissible penalty and are void and unenforceable. It seeks a declaratory judgment that the purported transfer of the deed is null and void and that the Property still belongs to First Union.

Counts III and IV allege that the transfer of the deed gave rise to a fraudulent transfer. Those claims were not pursued at trial and are deemed to have been abandoned.

First Union also has made a motion in the underlying bankruptcy case to have the recording of the deed set aside. It argues that this Court should excuse the late delivery of the May payment on grounds of "excusable neglect" pursuant to Rule 9006 of the Federal Rules of Bankruptcy Procedure.

## Discussion

### I.    Equity of Redemption

First Union contends that the delivery of the deed pursuant to the parties' Stipulation represented a security arrangement and not an outright conveyance of the Property, and that the provisions of the stipulation that authorized TD Capital to file the deed (and to take ownership of the Property) in the event of a later default were void and unenforceable under New York law.

### A.    Applicable New York Law

New York courts are especially protective of a mortgagor's right of redemption in the event of a default.  Under New York law, a mortgagor retains the absolute right to redeem property by repaying a mortgage debt at any time prior to the actual conclusion of a foreclosure sale.  *NYCTL 1999-1 Trust v. 573 Jackson Ave. Realty Corp.,* 921 N.E.2d 195, 199 (N.Y. 2009); *United Capital Corp. v. 183 Lorraine St. Assocs.,* 675 N.Y.S.2d 543 (App. Div. 1998); *Finance Inv. Co. (Bermuda) Ltd. v. Gossweiler*, 535 N.Y.S.2d 632, 633 (App. Div. 1988).  New York law does not permit a waiver, in advance, of the right of redemption.  *Mooney v. Byrne*, 57 N.E. 163, 165 (N.Y. 1900) (the right of redemption in inseparably connected with a mortgage and cannot be waived or abandoned by any stipulation in the contract made at the time).  Accordingly, any provision in a mortgage that purports to waive the right of redemption upon the occurrence of a future default, where such agreement is made prior to the occurrence of that default, is void and is unenforceable as a matter of New York public policy.  *Id.; Hughes v. Harlam*, 60 N.E. 22, 24 (N.Y. 1901); *Basile v. Erhal Holding Corp.*, 538 N.Y.S.2d 831, 833 (App. Div. 1989); *Maher v. Alma Realty Corp.*, 417 N.Y.S.2d 748, 749 (App. Div. 1979); *364 N.B.E. Corp. v. Edge Capital, LLC (In re 364 N.B.E. Corp.)*, at *4 (Bankr. E.D.N.Y. Dec. 29, 2015).  In this regard, New York courts adhere to the concept explained by the United States Supreme Court in *Peugh v. Davis*, 96 U.S. 332, 337 (1877), where the Court stated that the "equity of redemption is inseparably

9

connected with a mortgage . . . This right cannot be waived or abandoned by any stipulation of the parties made at the time, even if embodied in the mortgage.  This is a doctrine from which a court of equity never deviates."

Section 320 of the New York Real Property Law also states that "[a] deed conveying real property, which, by any other instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, must be considered a mortgage . . ." N.Y. Real Prop. Law § 320.  The New York court decisions applying section 320 have held that if a deed is delivered as security for the payment of a debt, and not as an outright conveyance of property at the time the deed is delivered, then the arrangement is a mortgage as a matter of law. *See Resseguie v. Adams*, 388 N.Y.S.2d 955, 956-57 (App. Div. 1976), *aff'd sub nom. Locator-Map, Inc. v. Adams*, 368 N.E.2d 836 (N.Y. 1977); *Corcillo v. Martut*, 395 N.Y.S.2d 696, 698 (App. Div. 1977) ("[i]t is well established that where a deed is given as security, it becomes a mortgage by operation of law, and where the deed is accompanied by a written instrument showing that it is intended as security only, it is a mortgage regardless of its terms") (internal citations and quotation marks omitted); *Mooney*, 57 N.E. at 164 ("a deed, although absolute on its face, when given as security only, is a mortgage by operation of law").

In numerous cases the New York courts have been called upon to apply these principles to situations in which parties have delivered "deeds in escrow" and have agreed that the deeds may be recorded if and when a future default occurs.  The New York courts have consistently held that in such cases the holder of the deed, so long as the deed was given as security and not as an outright conveyance at the time it was delivered, is not permitted to file to file the deed and to take ownership of the property in the event that a future default occurs.  Instead, the holder "must proceed in the same manner as any other mortgagee – by foreclosure and sale – to

10

extinguish the mortgagor's interest." *Leonia Bank v. Kouri*, 772 N.Y.S.2d 251, 254 (App. Div. 2004); *see also In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *4 (Bankr. E.D.N.Y. Dec. 29, 2015); *Patmos Fifth Real Estate Inc. v. Mazl Bldg., LLC*, 2 N.Y.S.3d 83, 86 (App. Div. 2015); *Bouffard v. Befese, LLC,* 976 N.Y.S.2d 510, 513-14 (App. Div. 2013); *Vitvitsky v. Heim*, 860 N.Y.S.2d 305, 307-08 (App. Div. 2008); *Basile*, 538 N.Y.S.2d at 831; *Gioia v. Gioia*, 652 N.Y.S.2d 63 (App. Div. 1996).

No contrary New York state court authority has been cited by the parties. TD Capital's counsel asserted, during one of the earlier hearings in this matter, that in practice some of the New York courts do not follow the foregoing rules. However, TD Capital has never offered any evidence of a contrary practice, or any citation to any contrary authority. Instead, the available authorities all confirm the rules that are described above.

Under New York law, the determination of whether a deed was given as security for the payment of a debt, or whether it was given as an absolute conveyance, turns upon the intention of the parties. *Hughes*, 60 N.E. at 23; *Maher*, 417 N.Y.S.2d at 749. There is some confusion in the case law as to the standard of proof that is required when there is a dispute over this issue. There are a few cases that hold that the burden is on the party claiming that a deed transfer is really a mortgage to prove, by clear and convincing evidence, that the parties' arrangement constituted a mortgage and not an outright conveyance. *See, e.g., Zivotosky v. Max*, 75 N.Y.S.2d 553, 556-57 (Sup. Ct. Cortland Cnty., 1947) (holding, without citation, that proof must be "clear and convincing" to overcome the presumption that a deed conveys absolute title, but also holding that in that case plaintiffs had carried their burden of showing "by a preponderance of the evidence" that the arrangement was a mortgage and not a conveyance); *see also In re 716 Third Ave. Holding Corp.*, 340 F.2d 42, 44 (2d Cir. 1964) (noting that the district court had applied a

11

"clear and convincing evidence" burden and citing to the *Zivotosky* decision as support).  At least

one other decision suggests that the *terms* of the mortgage must be proved by clear and

convincing evidence.  *See, e.g., Ressequie,* 388 N.Y.S.2d at 957.

If a "clear and convincing evidence" test were required, however, one would expect to

see that confirmed in the many other New York state court decisions that have addressed this

issue.  But that is not the case.  Instead, the New York courts usually describe the issue as one of

intent, without suggesting that any special standard of proof must be met.  The reported decisions

most often cite to the opinion in *Corcillo v. Martut, Inc.*, 395 N.Y.S.2d 696, 698 (App. Div.

1977), *aff'd* 383 N.E.2d 113 (N.Y. 1978), which says that in determining whether a deed was

meant as security, "examination may be made not only of the deed and a written agreement

executed at the same time, but also [of] oral testimony bearing on the intent of the parties and to

a consideration [of] the surrounding circumstances and acts of the parties."  395 N.Y.S.2d at 698.

There is nothing in *Corcillo* that suggests that any burden of proof should be applied other than a

"preponderance of the evidence" standard.

To add to the confusion: there are many statements in New York decisions that suggest

that instead of requiring a higher burden of proof before finding a mortgage, courts should

resolve all doubtful cases in favor of finding that an arrangement is a mortgage and not an

outright conveyance.  *See, e.g., Hughes*, 60 N.E. at 23 (holding that "[i]n all doubtful cases a

contract will be construed to be a mortgage rather than a conditional sale" in order to preserve

the right of redemption); *see also Kouri*, 772 N.Y.S.2d at 254 (holding that Real Property Law

section 320 "does not require a conclusive showing that the transfer was intended as a security;

rather, it is sufficient that the conveyance 'appears to be' intended only as a security in the nature

of a mortgage"); *Patmos*, 2 N.Y.S.3d at 86 (same).

12

In this case it does not matter what burden of proof is applied.  As discussed below, the evidence makes it overwhelmingly clear that the parties did not intend to accomplish an absolute conveyance of the Property at the time the deed was delivered, no matter what standard of proof is applied.  In fact, no reasonable argument could be made to the contrary based on the record before the Court.  *See, e.g., Kouri*, 772 N.Y.S.2d at 254.

**B.**    **The Stipulation Plainly Contemplated a Security Arrangement and Not an Outright Conveyance**

The evidence at trial showed clearly that no outright conveyance of the Property occurred when the Stipulation was executed, and that instead the arrangement between the parties was a continuing security arrangement.

<u>First</u>, the Stipulation itself makes clear that First Union was to continue to own the Property, that it had a right sell the Property or to refinance the debt owed to TD Capital, that the delivery of the deed was not intended to convey title at the time it was delivered, and that TD Capital's interest was that of a secured lender.  More particularly:

- The last Recital, on page 3 of the Stipulation, stated that the parties contemplated that the parties were entering into the Stipulation "to avoid foreclosure, preserve loss of value, and to preserve the Debtor's Property."

- Paragraph 1 of the Stipulation acknowledged the prior foreclosure judgment and recognized that TD Capital had a "first priority" security lien on the Property.

- Paragraph 4 of the Stipulation stated that a deed would be delivered but that it was to be held in escrow and could not be recorded except on the terms set forth in the agreement.

- Paragraph 6(g) required First Union to continue to pay all carrying costs and to shoulder all of the burdens of ownership. It also referred to the possibility that TD Capital might have to make payments "to protect its lien." Stipulation, at ¶ 6.

- Paragraph 13 confirmed First Union's right to sell the Property at any time – something First Union could not do if the Property had already conveyed the Property to TD Capital.

- Paragraph 14 confirmed that TD Capital could submit an offer to buy the Property – something TD Capital would not need to do if the Property had already been conveyed to TD Capital.

- If a default occurred in the first 180 days, paragraph 12 of the agreement stated that TD Capital could publish notice of a sale in accordance with the foreclosure judgment, but that First Union retained its right of redemption "prior to gavel coming down at such auction." Of course, there would have been no right of redemption, and no need for a sale, if the Property had already been conveyed to TD Capital.

- Paragraph 12 of the Stipulation also stated that if a default occurred after 180 days had elapsed, TD Capital could just take ownership of the deed. But that provision makes clear that title had not already passed when the Stipulation was executed and the deed was delivered.

- Finally, paragraph 21 of the Stipulation stated explicitly that "the Deed shall not be effective upon delivery, but only at such time, if any, as the Deed is released from escrow and recorded."

The wording of these provisions makes clear that no conveyance occurred at the time the deed was initially delivered. The delivery of the deed was a security arrangement to protect TD

Capital in the event of a default in making payments, and TD Capital's interest was in the form of a "lien" on the Property.

Second, the motion for approval of the Stipulation also clearly indicated that the Stipulation was meant as security for a debt, rather than as a conveyance. The Motion (as did the Stipulation) contemplated either a refinancing or a sale of the Property prior to the Stipulation's expiration. The motion further stated explicitly that "[t]he [Stipulation] does not contemplate an actual transfer of the Property outside of a sale or state court foreclosure process unless the Debtor defaults under the [Stipulation] and at least 180 days have passed since this [Stipulation] was approved." Motion, at ¶ 45. These provisions of the motion also make clear that no "absolute conveyance" was intended or occurred at the time the Stipulation was executed.

Third, the order approving the Stipulation specifically stated that "nothing in the [Stipulation] shall impair the Debtor's state court right of redemption if the Property goes to a foreclosure sale," thereby further undercutting the notion that any "absolute conveyance" was intended. DX 3, at 23.

Fourth, no evidence was offered at trial of any contrary intent. In fact, Ms. Bokhour (the witness for TD Capital) acknowledged during her testimony that the parties did not make an absolute conveyance when the deed was delivered and did not intend to do so.

The evidence is conclusive and forecloses any contention that the agreement brought about an "outright" conveyance. The evidence compels the conclusion that the delivery of the deed was intended as security and that the arrangement therefore constituted a mortgage for purposes of New York law.

### C.    TD Capital's Contrary Arguments Lack Merit

TD Capital does not contest the general principles of New York law set forth above, and it does not argue that there was an outright conveyance of the Property when the deed was delivered.  TD Capital nevertheless has disputed whether the ordinary New York rule should be applied in the circumstances of this case.

First, TD Capital argues that a different rule should apply when an agreement to place a deed in escrow has been incorporated into a court-approved stipulation.  However, no New York state court decision has been cited for this proposition.  In fact, New York court decisions have repeatedly made clear a mortgagor's right of redemption is not waivable even pursuant to in-court stipulations that purport to grant deeds in lieu of foreclosure, where the delivery of the deed is intended to provide security and not to constitute an outright conveyance.  *See Vitvitsky*, 860 N.Y.S.2d at 306-08; *Basile*, 538 N.Y.S.2d at 832-33; *Maher*, 417 N.Y.S.2d at 749; *Gioia v. Gioia*, 652 N.Y.S.2d at 63-64; *In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *4.

In *Maher*, for example, the appellate division held that a waiver of a mortgagor's § 320 rights through a court-approved stipulation was ineffective because "it is settled that deeds given in security for the payment of a debt are mortgages" and "plaintiffs cannot waive their right of redemption even by stipulation in open court, since public policy forbids such a waiver." *Id.* at 749.  In *Basile*, the parties stipulated to an agreement under which a deed would be held in escrow and would not be recorded unless a default occurred.  The agreement was explicit, and the waiver of the right of redemption was acknowledged by the owner in open court when the stipulation was reached.  However, the state court later held that the waiver was ineffective and unenforceable under New York law.  *Id.* at 832-833.  In *Gioia*, a deed was delivered as part of a divorce decree.  The agreement stated that if the husband defaulted then the wife could either

16

foreclose or could "immediately record the deed in lieu of foreclosure."  After the husband

defaulted, however, the Second Department held that the deed could not simply be recorded

because it had been intended as security and not as an outright conveyance.  Instead, the wife's

sole recourse was to proceed by way of foreclosure.  652 N.Y.S.2d at 63-64.

The only supposedly contrary authority cited TD Capital is the decision by the Second

Circuit Court of Appeals in *Meyerson v. Werner*, 683 F.2d 723 (2d Cir. 1982).  *Meyerson* has

been cited by TD Capital for the proposition that a waiver of the right of redemption may be

enforced so long as it is incorporated in a court-approved stipulation.  However, that is not what

the Court held in *Meyerson*.

In *Meyerson*, the parties reached an agreement to settle a contempt proceeding.  The

defendant agreed to a confession of judgment in the amount of $630,000 and agreed to deliver a

deed transferring property to plaintiffs, with the understanding that plaintiffs could sell the

property to satisfy the $630,000 obligation but with the further agreement that any excess

proceeds would still be paid to the defendant.  The parties also agreed that if defendant paid

$380,000 within 45 days, the obligations would be canceled and no transfer of the property

would occur.  *Id.* at 725-26.  After time passed, and after the defendant did not make payment,

the defendant nevertheless sought to bar a sale, arguing that the prior arrangement was a

mortgage and that plaintiffs needed to follow state court foreclosure procedures to sell the

property.  The magistrate judge (whose findings were adopted by the district court) found that

under the circumstances of that particular case the original delivery of the deed "was an effective

transfer of ownership rather than a mortgage."  *Id.* at 724.  The Second Circuit upheld that

determination.  *Id.* at 727 ("It was the clear intention of the parties, approved and ordered by the

district court, that the transaction was not to be treated as a mortgage governed by [N.Y. Real

Prop. Law § 320].").  The Second Circuit also noted that the defendant had represented in open court, when the agreement was originally approved, that "an absolute deed was being given," and that plaintiffs had relied on that representation to their detriment.  *Id.* at 728.  As a result, the defendant was estopped from claiming that the arrangement was merely a mortgage.

The Second Circuit Court of Appeals did *not* hold in *Meyerson* that the equity of redemption may be waived when an arrangement does constitute a mortgage, or that New York foreclosure requirements can be cast aside when a "deed in escrow" provision is included in a court-approved stipulation, or that the delivery of a deed pursuant to such a stipulation must always be considered to be an absolute conveyance as opposed to a security arrangement.  Any such holding would have been plainly contrary to New York law, as reflected in the many New York court decisions rendered before and after *Meyerson* described above.  What the Court of Appeals actually held in *Meyerson* was that the sale arrangement in that case was enforceable precisely because it was not a mortgage, and because an outright conveyance had been intended and had occurred.  For these reasons, at least one other court has correctly held that the *Meyerson* decision did not alter the prevailing rule in New York and does not stand for the proposition that a right of redemption may be waived in an arrangement that is functionally a mortgage and not an outright conveyance of property, even if that arrangement is incorporated into a court-approved stipulation.  *See In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *4.

Second, TD Capital has argued that a different rule should be applied in these cases because TD Capital already held a security interest in the Property and did not need any additional security to be granted.  However, there is nothing in the New York case law that says that the rules described above apply only when "new" or "additional" security is being provided.  If that were the case, then under New York law it would be permissible to waive a right of

redemption whenever a mortgage is amended, so long as the amendment does not provide any new or additional security. But at least two of the decisions cited above have involved the delivery of deeds in connection with amendments to existing mortgages, and the courts in those cases held that the right of redemption could not be waived. *See Basile*, 538 N.Y.S. 2d at 832; *In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *1.

In the *Basile* case, for example, a party to a mortgage filed a usury complaint. *Basile*, 538 N.Y.S.2d at 832. The parties then settled their litigation by agreeing to a modification of the mortgage. *Id.* The modified agreement included an agreement to deliver a deed to be held in escrow. *Id.* The court held that the delivery of the deed was just a security arrangement and therefore was a mortgage. *Id.* at 833. It did not make any difference that a prior mortgage had been in place. *See Basile*, 538 N.Y.S.2d 831.

Similarly, in *In re 364 N.B.E. Corp.*, the parties to an existing mortgage entered into a forbearance agreement following a series of defaults. *In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *1. A stipulation signed after a further default on the forbearance agreement required the delivery of a deed in escrow. *Id.* There was no "new" security that was provided, but the court held that the modified arrangement continued to be a mortgage and that the delivery of the deed constituted a security arrangement, not an absolute conveyance. *Id.* at *3.

There is also no principled reason why the delivery of a deed in escrow should be treated differently depending upon whether it was delivered as part of the original mortgage or as part of a modification of a prior mortgage. So long as the continued relationship makes clear that the deed serves as security and not as an outright conveyance, the arrangement is still a mortgage and the secured party cannot simply file the deed upon the occurrence of a later default. It must

proceed with foreclosure if it wishes to terminate the owner's rights in the property, and must

respect the owner's right to redeem at any time prior to the completion of a foreclosure sale.

Third, TD Capital has argued that its prior mortgage merged into the foreclosure

judgment, so that it held a judgment lien rather than a lien granted by action of the parties. But

no decision has been cited to explain why this should make any difference. In *Vitvitsky v. Heim*,

860 N.Y.S.2d 305 (App. Div. 2008), for example, the parties agreed to the entry of a judgment

that would constitute a lien on the defendant's property. *Id.* at 306. The settlement further

provided that a deed would be held in escrow and could be recorded if there were any default

under the agreement. *Id.* The court held that the arrangement was a mortgage. *Id.* at 308. It did

not matter that the lien in that case arose from a court judgment, as opposed to a mortgage lien

that arose from the execution of mortgage documents. The important point was that the deed

was delivered to provide security in the event of a default, and was not intended to represent an

outright transfer when it was delivered. As a result, the equity of redemption could not be

waived and the owner's interest in the deed could not be terminated except by a foreclosure sale.

Fourth, TD Capital has argued that the stipulation just gave TD Capital what it could

have gotten under its prior foreclosure judgment if the parties had executed a deed in lieu of

foreclosure at that time. It is true that a party may execute a deed in lieu of foreclosure (and may

waive a right of redemption) with respect to a then-existing default. However, that is not what

the Stipulation provided. The Stipulation set forth the terms of a new arrangement between the

parties. It did not purport to give TD Capital the right to record the deed based on defaults that

allegedly had occurred prior to the time the Stipulation was executed. Instead, the Stipulation

provided that the deed could be recorded in the event of a *future* failure to make one of the

payments required by the Stipulation itself, provided that such failure occurred more than 180 days after the Stipulation took effect.  DX 3, at 35 ¶ 12.

A number of the decisions cited above involved situations in which a default existed under an existing mortgage at the time the parties entered into stipulations that included deed-in-escrow provisions.  *See In re 364 N.B.E. Corp.*, 2015 WL 9581323, at *1 (at least three defaults prior to executing stipulation with deed-in-escrow provision); *Corcillo*, 395 N.Y.S.2d at 697-98 (deed-in-escrow agreement entered into in part to induce other party to discontinue pending foreclosure action).  The teaching of these cases is that when a mortgage has been amended or extended or modified or otherwise effectively reinstated on new terms – even if done in response to an existing default – the right of redemption may not be waived in advance, and that an agreement to allow the recording of a deed upon a later default is void and unenforceable.

Here, it does not matter whether the parties *could* have made an outright conveyance of the Property at the time of the prior stipulation, because they plainly did not do so.  The arrangement was not an outright conveyance at the time of the Stipulation, and so it was a mortgage as a matter of New York law.  The right of redemption therefore remained (and could not be barred) in the event a future default occurred under the Stipulation.

Fifth, TD Capital argues that First Union should be barred from raising the foregoing contentions.  It points out that First Union agreed, in the Stipulation, that it would not "interfere" with TD Capital's "exercise of its rights and remedies" under the Stipulation, the original foreclosure judgment, or under applicable law.  Stipulation, at ¶ 20.  The relief sought in the adversary proceeding, however, is a declaration as to what the parties' rights and remedies are.  It does not "interfere" with TD Capital's remedies to obtain a ruling as to what the permissible remedies are, and to bar actions that New York law does not permit.

Furthermore, even if the agreement not to "interfere" with remedies were to be interpreted as an agreement not to challenge the transfer of title to the Property (as TD Capital urges the Court to hold), it is plain that such an agreement would itself be unenforceable. As a matter of New York law, and the many cases cited above, any purported waiver of the right of redemption is unenforceable and must be disregarded. *Basile*, 538 N.Y.S.2d at 833; *Maher*, 417 N.Y.S.2d at 749; *In re 364 N.B.E. Corp.*, 2015 WL 9581323, at \*4; *Patmos*, 2 N.Y.S.3d at 86; *Kouri*, 772 N.Y.S.2d at 255. This rule is applicable regardless of whether the agreement is phrased as a waiver of the right of redemption or (as argued here) as a purported agreement "not to challenge" the effect of such a waiver.

The Supreme Court ruled long ago, though in quite a different context, that if a provision in a contract is void, then the consent of the defendant cannot neutralize the problem, and that "[a] stipulation in the most solemn form to waive the objection, would be tainted with the vice of the original contract, and void for the same reasons." *Coppell v. Hall*, 74 U.S. 542, 558-59 (1869). The New York Court of Appeals expressed a similar view in *Mooney*, 57 N.E. at 165, where it held that "[a]lthough many attempts have been made, no form of covenant has yet been devised that will cut off the right of a mortgagor to redeem, even after the law day has long passed by." *Id.* (internal citations omitted).

Here, the agreement not to "interfere" with the exercise of remedies, even if it could properly be interpreted as an agreement not to challenge the recording of the deed after the fact, is just another form of covenant that is meant to cut off the right of First Union to redeem its Property. The purported waiver of the right to object to the recording of the deed is no more enforceable than the waiver of the right of redemption. The New York courts have made quite clear that such provisions are not enforceable as a matter of law and public policy.

22

In fact, even if First Union were to be barred from raising the issue, there is authority in New York to the effect that contracts that are unenforceable on grounds of public policy raise issues that courts should address on their own initiative, even if the parties do not or cannot raise those issues. In *Attridge v. Pembroke*, 256 N.Y.S. 257 (App. Div. 1932), the court held:

> The refusal of the courts to enforce contracts which are against public policy is not based upon any desire to relieve a party from the obligation which he has assumed, but rather upon the theory that such an agreement is injurious to the interests of society in general, and that the only way to stop the making of such contracts is to refuse to enforce them, and to leave the parties without a remedy for a breach thereof. It is not necessary to plead the illegality of a contract which is contrary to public policy; the court will, of its own motion, step in and deny the right to any relief thereunder without reference to the state of the pleadings, whenever it becomes apparent that the agreement is antagonistic to the interests of the public.

*Id.* at 102-03 (internal citations omitted); *see also Spiegel v. 1065 Park Ave. Corp.*, 759 N.Y.S.2d 461, 463 (App. Div. 2003).

<u>Finally</u>, TD Capital has implied that the Court approval of the Stipulation should be treated as a prior determination by the Court that the deed-recording provisions are valid and are in compliance with New York law. But the only issue presented to the Court, when the parties sought approval of the Stipulation, was whether First Union could enter into it. The motion papers, and the record of the proceedings, do not include any request for a ruling as to the enforceability of any of the terms of the Stipulation. There was no mention of the principles of New York law that are set forth above, and certainly there was no request that the Court approve and give force to an arrangement that would be contrary to what New York law otherwise would have provided. TD Capital did not seek a ruling on the issue; instead, it took its chances as to whether the terms were enforceable. In fact, if TD Capital had informed the Court that the Court's approval of the Stipulation was intended to bless an outcome that would be inconsistent with New York law, the Court undoubtedly would have refused to approve that result.

For the reasons set forth above, the decision of whether an arrangement is a "security" arrangement for purposes of the statute and the New York case law has nothing to do with whether the parties' agreement has been court-approved, or whether the deed is "additional" or "new" security for a debt, or whether a foreclosure judgment has already been obtained, or whether a prior default has occurred, or whether an existing mortgage has been amended.  Those are all distinctions that TD Capital has attempted to make but that have no grounding in the case law or in the reasoning of the reported New York decisions.  Instead, the issue is whether the parties made an "outright" transfer when the deed was delivered.  No matter how TD Capital seeks to characterize the situation, and regardless of whether its lien is characterized as a judgment lien or as the original lien granted when the mortgage was provided, the fact remains that the delivery of the deed to TD Capital was never intended to bring about an immediate transfer of the Property.  The terms of the parties' agreement, their conduct, and their prior statements all make clear that no outright conveyance was intended here and that the arrangement was made to secure amounts owed to TD Capital.

The Stipulation in this case did not merely involve a consent to the entry of a foreclosure judgment, or a waiver of defenses to foreclosure, or a consent to an auction sale, or an agreement that the foreclosure judgment would still apply if a payment were missed, or any of the kinds of things that a litigant might try to justify in settlement of a prior foreclosure case.  Instead, the Stipulation was an agreement to a revised security arrangement, but also with a purported waiver of the right of redemption and a waiver of foreclosure requirements in the event of a future default.  That waiver of the right of redemption is unenforceable, and the provision authorizing TD Capital to record the deed (and to take ownership of the Property) is void and unenforceable.

24

As a result, the recording of the deed was void and must be vacated, and the ownership of the Property must be restored to First Union.

## II.    Penalty Issues

The second claim for relief is that the provisions of the Stipulation that gave TD Capital the option to record the deed, regardless of what the value of the Property might be at the time of the recording and regardless of the amount of the outstanding debt at that time, imposed a contractual penalty that cannot be enforced under New York law.

It is clear under New York law and the common law generally that remedies in contracts are supposed to be reasonably designed to provide compensation for actual losses and that "penalties" are not enforceable.  *See, e.g., Willner v. Willner*, 538 N.Y.S.2d 599, 600 (App. Div. 1989); *Gilad Realty Corp. v. Ripley Pitkin Ave., Inc.*, 368 N.Y.S.2d 228, 229 (App. Div. 1975) ("a failure to pay a sum of money due will rarely, if ever, justify a further sum, in excess of interest, to be paid by way of liquidated damages.").  It is also clear that parties should not contract in advance as to what the remedy will be (by specifying liquidated damages, for example) unless actual damages would be difficult to calculate in the future and unless the agreed remedy is a reasonable approximation of the damages.  *United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs., Inc.*, 674 F.2d 134, 142 (2d Cir. 1982); *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir. 1982).

TD Capital argues that the provision allowing it to record the deed was reasonable and enforceable.  However, the terms of the agreement raise "penalty" considerations in a number of different ways.

First, there was no reason to expect difficulty in calculating damages.  First Union owes a debt.  The amount to be paid is very easily calculated.  *See Quaker Oats Co. v. Reilly*, 711 N.Y.S.2d 498, 499 (App. Div. 2000) (debt was easily calculated and a liquidated damages

provision was not permissible); *Gilad Realty Corp.*, 368 N.Y.S.2d at 229 (finding that the amount of the loss due to undisputed missed lease payments is "readily ascertainable").

Second, providing for a turnover of the Property and taking away the right of redemption – and doing so no matter what the Property's value might be – is not a "reasonable" way of approximating what the actual damages would be. Note that under the agreement TD Capital had the same option (taking ownership of the Property) regardless of whether the unpaid debt was $1.5 million or only one dollar, and regardless of whether the Property was then worth $1 million or $20 million. *See LeRoy v. Sayers*, 635 N.Y.S.2d 217, 222-23 (App. Div. 1995) (contract that provided for a fixed remedy, regardless of whether damages were negligible or large, was a penalty and was unenforceable).

Third, the agreement here was not a true "liquidated damages" provision at all. The Stipulation gave TD Capital the "option" to take the deed, but it did not require TD Capital to do so. It was purely an option that was given to TD Capital, and one that by its terms was most likely to be exercised if at the relevant time the Property was worth more than the outstanding debt. Courts have held that this kind of "option" to obtain an excess remedy is inherently a penalty and is not enforceable as a matter of New York law. *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs.)*, 23 B.R. 104, 112 (Bankr. S.D.N.Y. 1982); *Jarro Building Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 426 (App. Div. 1967).

In the *Jarro* case, for example, the court considered a construction contract that provided that if a breach occurred after work had been commenced, the contractor would be entitled to a payment of 25% of the contract price as liquidated damages, but that this entitlement would not preclude the contractor from suing for actual damages if it saw fit to do so. *Jarro Building Indus. Corp.*, 281 N.Y.S.2d at 421-22. The court held that the provision was not a true

26

"liquidated damages" provision. *Id.* at 425. It did not provide a remedy in lieu of actual

damages in a situation where actual damages were difficult to determine. Instead, it gave the

contracting party a choice between actual damages and an alternative that could exceed actual

damages. *Id.* at 426. As a result the provision was inherently a penalty. New York courts have

reached similar conclusions in other cases. *See, e.g., Dalston Constr. Corp. v. Wallace*, 214

N.Y.S.2d 191, 193 (Dist. Ct. Nassau Cty., 2d Dist., 1960).

In this case, there was no difficulty in assessing damages. There was also no agreement

that some agreed payment or other consideration would be provided in lieu of an actual damage

calculation. There was just an option to pursue ordinary foreclosure remedies or, instead, to take

the Property.

TD Capital argues that at the time the agreement was made the parties did not believe that

the Property's value was in excess of the debt and that the reasonableness of the deed forfeiture

should be determined at the time of the agreement, and not in hindsight. *See United Merchs. &*

*Mfrs., Inc.*, 674 F.2d at 142; *Truck Rent-A-Center v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420,

425 (1977). However, regardless of what the parties thought the Property was actually worth at

the time they made the agreement, the evidence at trial made clear that they contemplated that

the value might well increase. The "option" to take the Property just provided an additional

optional remedy, in lieu of and in excess of actual damages, that was most likely to be exercised

if the value of the Property had increased, thereby providing TD Capital with a windfall in

excess of its actual loss. That option amounted to a penalty under New York law.

TD Capital argued at trial that the purpose of allowing the deed to be recorded was to

prevent delay and expense, and not to impose a penalty. However, a waiver of foreclosure

defenses and a consent to entry of a foreclosure judgment would have sufficed to eliminate delay

and to avoid all but relatively nominal expenses.  In fact, the Stipulation already contained such provisions.  The "deed in escrow" did not just facilitate quick action, and did not just avoid delay.  It sacrificed the right of redemption and the right to a surplus in the event the value exceeded the amount of the debt, when there was no legitimate purpose in doing so and when that resulted only in a potential windfall to TD Capital.

The Court therefore concludes that the provisions of the agreement that entitled TD Capital to record the deed in its own name upon default, without regard to the nature of the default, the amount of the then-outstanding debt, and the value of the Property at the time of the default, was inherently unreasonable and a penalty, and was unenforceable under New York law.

As noted above, TD Capital has argued that First Union should be barred from challenging the provisions in the contract that permit the recording of the deed because First Union agreed not to "interfere" with TD Capital's exercise of remedies.  However, what First Union seeks here is a declaration as to what TD Capital's remedies are.  It does not "interfere" with remedies to obtain such a declaration and to limit TD Capital to the remedies that New York law permits.  Furthermore, even if the agreement not to "interfere" with remedies were to be interpreted as an agreement not to challenge the recording of the deed on "penalty" grounds, that agreement would be unenforceable for the same reason that the penalty itself is unenforceable.  A party's agreement to a damage provision that constitutes a penalty is not enforceable as a matter of public policy, and the same agreement cannot be insulated just by adding an additional agreement that a party will not attack it.

The second cause of action therefore provides independent grounds upon which the recording of the deed must be vacated and the Property must be restored to First Union.

III.    **The Request for Relief under Rule 9006**

Finally, First Union contends that the Court should excuse the failure to make a timely

May payment on grounds of "excusable neglect" under Rule 9006.

A.    **Is the Payment Deadline in the Stipulation a Deadline Imposed by Court
        Order that the Court May Extend?**

The Stipulation provided that First Union would be in default if a monthly payment were

not received by the last day of the month.  The first question for the Court to consider is whether

that payment deadline was a deadline set by "court order" for purposes of Rule 9006.  The

parties (for different reasons) have each argued that it is.  First Union wishes to treat the payment

deadline as a court-ordered deadline so that Rule 9006 will apply.  TD Capital, on the other hand,

wishes to characterize the entire Stipulation as a "court-ordered" outcome that is not even subject

to the limits that are otherwise imposed by New York law.

The Court is not convinced.  The payment terms of the Stipulation were matters of

agreement between the parties.  First Union needed to obtain prior approval of any settlement

that it wished to make pursuant to Rule 9019, and it needed court approval to make agreements

that involved the use of assets outside of the ordinary course of business.  *See* Fed. R. Bankr. P.

9019; 11 U.S.C. § 363(b).  However, in considering a motion for approval of a settlement the

Court need only "canvass the issues" to see if the "settlement falls below the lowest point in the

range of reasonableness."  *In re Teltronics Serv., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985) (citing *In

re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).  Similarly, in determining whether to grant

a debtor authority to enter into an agreement to use assets out of the ordinary course of business,

the ordinary standard is whether the debtor has exercised reasonable business judgment.  *In re

Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (requiring "a good business reason" to grant a

section 363 motion).  If the standards are met, the debtor is given the green light to do what it

proposes to do.  But that approval, by itself, does not mean that the court has mandated any

particular behavior.

The Court retained jurisdiction to hear disputes arising out of the Stipulation, and that

sufficed to confer jurisdiction over future disputes.  *Kokkonen v. Guardian Life Ins. Co.*, 511

U.S. 375, 381 (1994).  The Court also "so ordered" the Stipulation.  (DX 4.)  The "so ordering"

of a stipulation ordinarily means that at least some of the approved terms are not merely

agreements of the parties, but directions of the court, at least insofar as the "so ordered" terms

relate to provisions that can only be implemented by the court itself.  *See, e.g., Geller v. Branic

Int'l Realty Corp.*, 212 F.3d 734, 737 (2d Cir. 2000).  However, courts should be wary of treating

the mere use of the words "so ordered" as though they automatically mean that each and every

act that a party has contractually agreed to perform has been changed into something that is

backed by a court mandate and that is punishable by contempt.  Sometimes, in context, the use of

the words "so ordered" just means that a matter has been approved.  The case law therefore

provides many examples where the mere use of the "so ordered" language was deemed

insufficient to convert the terms of an approved agreement into terms "ordered" by a court.  *See,

e.g., Torres v. Walker,* 356 F.3d 238, 243-44 (2d Cir. 2004) (holding that a "so ordered"

stipulation that required payment of $1,000 to plaintiff was not a money "judgment" entered by

the court); *Francis v. Excelsior Coll.*, 2017 U.S. Dist. LEXIS 71334, at *9 (N.D.N.Y. 2017),

*adopted by Francis v. Excelsior Coll.*, 2017 U.S. Dist. LEXIS 83713 (N.D.N.Y. 2017)

(settlement agreement was "so ordered" but the court held this was not sufficient to "incorporate

the terms of the agreement in an order" for purposes of providing continued jurisdiction); *United

States v. 115-98 Park Lane South*, 2012 U.S. Dist. LEXIS 126067 (E.D.N.Y. 2012) (court "so

ordered" a settlement stipulation but later held that in doing so it had merely approved an

agreement, had not granted any court relief and had not converted the agreement into a court order); *Health Midwest Office Facilities Corp. v. Zipper (In re Zipper)*, 207 B.R. 695, 699 (Bankr. D. Kan. 1997) (finding no evidence that the court intended to mandate particular conduct, as opposed to approving a settlement, and holding that an order approving a settlement did not convert each term of the settlement into a court mandate that was punishable by contempt).

In this case, there is no indication that the words "so ordered" meant anything other than that the Court had granted the requested authority for First Union to enter into the Stipulation. The Stipulation includes payment terms, but there is nothing in the Court's separate Order, or in the Stipulation itself, or in any evidence offered by the parties, that supports the notion that the Court intended (through its approval of the Stipulation) to compel First Union to make payments at the designated times, on pain of contempt sanctions if it failed to do so. Similarly, neither party acted as though the Court's approval was required when the parties agreed, informally, to extend the deadline for the receipt of the May 2015 payment through the close of business on June 2, 2015. The notion that First Union would make payments by the end of the month was treated by the parties as a matter of contract, not as a deadline that the Court had imposed by court order.

In addition, although the Court "so ordered" the Stipulation, it also issued a separate Order that specified those particular terms that would constitute orders of the Court as opposed to matters of contract between the parties. In some respects those terms are narrower in scope that the terms in the Stipulation. For example, the Stipulation provided that First Union would not interfere with a foreclosure sale or other exercise of remedies. The Order, by contrast, merely states that in the event *of a foreclosure sale* First Union would be barred from interfering

with the conduct of such a sale.  DX 5.  The scope of the conduct that was barred by court order

was narrower than the scope of the purported contractual agreement.  If the "so-ordering" of the

Stipulation was meant to convert each term of the Stipulation into a court-ordered term, then it

would not have been necessary for the Order to say anything other than that the Stipulation was

"so ordered" and that the Court retained jurisdiction over future disputes.  The fact that the

parties (and the Court) thought it necessary to include particular provisions in the separate Order

demonstrates that they understood that the terms of the Stipulation were parts of an agreement

that First Union was authorized to make, but were not "court orders" in all respects.

First Union has cited to the decision of the Seventh Circuit Court of Appeals in *Siemens*

*Energy & Automation, Inc. v. Good (In re Heartland Steel, Inc.)*, 389 F.3d 741, 745 (7th Cir.

2004).  But the circumstances in *Heartland* were very different.  In *Heartland*, the Court of

Appeals considered whether a deadline for the submission of claims, set forth in a confirmed

plan of reorganization, was subject to later modification by the court under Rule 9006.  The

Court of Appeals noted that a confirmed plan is "contract-like for some purposes."  *Id.* at 745.

However, the deciding factor in *Heartland*, as the district court had noted, was that "[w]ithout

the Bankruptcy Court's confirmation order, there would be no period of time to compute."  *Id.*

(*quoting Good v. Bascon, Inc. (In re Heartland Steel)*, 2003 U.S. Dist. LEXIS 11245 (S.D. Ind.

June 26, 2003), at *12).  In other words, the claims submission deadline in *Heartland* could not

have been imposed by contract.  The deadline had no force, as to the creditors it purported to

bind, except to the extent the Court imposed the deadline by court order.  Once the deadline was

imposed by court order, it was effective as to everyone, regardless of whether they had

contractually agreed to it.

This case is different.  This case does not involve a deadline applicable to creditors generally, or an order by the Court to do something on or before a particular date.  The relevant provisions here are ordinary contract provisions relating to the time by which monthly payments would be made.

There undoubtedly are circumstances under which deadlines in "so ordered" agreements are subject to Rule 9006.  In this particular case, however, the Court does not believe that the mere fact that the court approved and "so ordered" the Stipulation is enough to transform the contractual payment deadlines into deadlines set by "court order" that may be extended pursuant to Rule 9006.

The foregoing ruling makes it unnecessary to consider other issues as to the Rule 9006 application.  However, it is likely that there will be appeals of the rulings set forth in this decision, and for the sake of completeness the Court will make its rulings on all of the factual and legal issues before it.

## B.    Whether the Motion is Governed by Rule 9024 or Rule 9006

TD Capital argues that the Court should treat the motion as an application for modification of the Stipulation itself under Rule 9024, which incorporates Rule 60(b) of the Federal Rules of Civil Procedure, and not as a motion under Rule 9006.  Fed. R. Bankr. P. 9024. If this were correct, and if the application were treated as a motion under Rule 9024, the motion would face a number of obstacles.  The one-year time period has passed under which relief could be sought under Rule 60(b)(1) on grounds of "excusable neglect," and a party may not invoke Rule 60(b)(6) to evade the time limit in Rule 60(b)(1).  *Wright v. Poole*, 81 F.Supp.3d 280, 289-90 (S.D.N.Y. 2014) (noting that Rule 60(b)(6) may not be used to circumvent the one-year limitation of a motion that properly should have been brought under Rule 60(b)(1)-(3));

*Maduakolam v. Columbia Univ.*, 866 F.2d 53, 55 (2d Cir. 1989) (noting that relief may be sought

under rule 60(b)(6) "only if the other, more specific grounds for relief encompassed by [Rule

60(b)] are inapplicable"); *Nemaizer v. Baker*, 793 F.2d 58, 63 (noting that because Rule 60(b)(6)

"applies only when no other subsection is available," excusable neglect may not be a basis for

relief under that subsection).  In addition, Rule 9006 cannot be used to extend the time periods

that are applicable under Rule 9024.  Fed. R. Bankr. P. 9006(b)(2).

TD Capital argues that granting more time would change the prior court "order" (*i.e.*, the

Stipulation), and therefore that Rule 9024 must apply, to the exclusion of Rule 9006.  However,

Rule 9006(b) provides that if an act must be done within a specified period "by order of court,"

the court "for cause shown" may enlarge the time (even if application is made after the time has

passed) based on "excusable neglect."  Fed. R. Bankr. P. 9006(b)(1).  If relief from a court-

ordered deadline could only be sought under Rule 9024 (as TD Capital asserts), then this

language in Rule 9006 would be meaningless.

The correct view is that Rule 9024 applies to the extent that a party seeks to modify an

order based on "excusable neglect" led to the entry of the order itself.  Such an application is

only timely if it is made within one year of the entry of the relevant order.  On the other hand,

Rule 9006 applies to the extent that a party seeks relief from a court-ordered deadline based on

excusable neglect that post-dates the entry of the order and which is responsible for the party's

failure to comply with the deadline previously set by the court.

Here, there is no claim here that there was "excusable neglect" that led to the Stipulation

itself.  Furthermore, First Union is not seeking to change (for all instances) the payment terms of

the Stipulation.  Instead, First Union is seeking to be excused from a single instance of lateness

that occurred long after the Stipulation was approved, based on excusable neglect that post-dated

the Stipulation.  The rule that governs First Union's motion (assuming that the deadlines were

matters of court order) therefore would be Rule 9006, not Rule 9024.

### C.    The Evidence as to Excusable Neglect

The leading decision on the application of "excusable neglect" standards is the decision

of the United States Supreme Court in *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507

U.S. 380 (1993).  In *Pioneer*, the bankruptcy court had established a bar date of August 3, 1989.

Claimants filed claims approximately 20 days after the bar date, along with a motion seeking

permission to do so notwithstanding the lateness of the claims.  Counsel claimed that he had

been experiencing "a major and significant disruption" in his life due to his withdrawal from his

former law firm and was unaware of the bar date until after the date had passed.  After a remand,

the bankruptcy court found (among other things) that the delay in filing the claims would not

prejudice the estate and would not have an adverse impact on the case.  However, the court also

found that counsel had been negligent in missing the bar date, and "to a degree" had been

indifferent to it.  The district court affirmed the ruling, but the Court of Appeals for the Sixth

Circuit reversed, holding that the claimants should not be penalized for errors made by their

counsel.  *Id.* at 384-86.

The Supreme Court granted certiorari to resolve differences among the Circuits as to the

meaning of "excusable neglect."  *Id.* at 387.  In its decision, the Supreme Court rejected the

suggestion that "excusable neglect" only exists if a missed deadline is due to circumstances

beyond the reasonable control of a party.  *Id.* at 391.  The Court noted that the wording of the

Rule shows that relief is intended to be available if a deadline is missed due to "neglect," which

includes instances in which deadlines are missed due to carelessness or inattentiveness.  *Id.* at

35

388.  Accordingly, the term "neglect" encompasses "both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." *Id*. at 388.

The Supreme Court also held that the determination of whether neglect is "excusable" is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id*. at 395.  The relevant factors include: (1) the danger of prejudice, (2) the length of the delay and its potential impact on proceedings, (3) the reason for the delay, including whether it was in the reasonable control of the movant, and (4) whether the movant acted in good faith. *Id*.  However, the Supreme Court rejected the Sixth Circuit's holding that a party should not be held responsible for the excusable neglect of its counsel.  *Id.* at 396.

Applying these principles, the Supreme Court held that excusable neglect had been demonstrated in *Pioneer*.  *Id.* at 397-99.  It pointed to the bankruptcy court's factual findings that the delay was not prejudicial and that the claimants and their counsel had acted in good faith, and held that those factors "weigh strongly" in favor of permitting the tardy claim.  *Id*. at 398.  The Court gave "little weight" to the fact that counsel was allegedly experiencing upheaval in his law practice.  *Id*.  However, since the bar date notice had been set forth in a notice of a creditor meeting (without any indication in the title of the notice that it also included information about a bar date), the Supreme Court held that counsel's failure to be aware of the bar date, coupled with the lack of prejudice and good faith, constituted "excusable" neglect.  *Id*. at 398-399.

The Second Circuit has taken "a hard line" in applying the *Pioneer* factors.  *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003).  In *Silivanch*, the Second Circuit applied the *Pioneer* factors in determining whether an untimely filing of an appeal was due to "excusable neglect."  The Court held that the third of the *Pioneer* factors (the reason for a delay and whether it was in the reasonable control of the movant) is to be given the most weight in

determining whether excusable neglect has been shown.  It further instructed that if a deadline is

clear and understood (but is missed anyway) "we continue to expect that a party claiming

excusable neglect will, in the ordinary course, lose under the *Pioneer* test."  *Silivanch*, 333 F.3d

at 366-67.  The *Silivanch* decision was reaffirmed in *Midland Cogeneration Venture L.P v.

Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 122 (2d Cir. 2005), where the Court rejected a

request for relief from a bar date based on allegations of "excusable neglect."

There are some parallels between the findings in *Pioneer* and what the evidence showed

in this case.  It is plain that the lateness of the May payment did not materially prejudice TD

Capital in the sense contemplated by the rule and by the *Pioneer* decision.  TD Capital cannot

seriously contend that it was harmed by getting a payment on June 3, 2015 rather than by the

agreed extended date of June 2, 2015.  TD Capital argued that it would be prejudiced if its taking

of the deed were to be reversed, but that is not the relevant question.  In deciding whether the

lateness was excusable the issue should be whether the lateness itself hurt TD Capital – not

whether TD Capital will lose a giant windfall if the lateness is excused and if the transfer is

undone.  In fact, as an equitable matter the giant windfall is a factor that should weigh in favor of

finding the lateness to be excusable.

On the other hand, it cannot be said that the delivery of payment was entirely outside the

control of First Union.  It is also clear that there was some degree of negligence in First Union's

failure to make a timely payment.  The existence of negligence by itself is not fatal, because (as

the Supreme Court held) the language of the Rule contemplates situations in which "neglect" has

occurred.  Here, though, Dr. Wilson was aware of the payment deadline.  He knew the terms of

the Stipulation, had been making payments for months, and had been reminded of the due date

when Ms. Bokhour called him in South Carolina.

The Court understands that Dr. Wilson was distracted when he learned of his nephew's death, and that he spent more time in South Carolina than he had planned. The Court has sympathy for his circumstances. However, the payment was actually due on May 1, and was already late when Dr. Wilson learned of his nephew's death. Dr. Wilson also received a reminder of the due date during a call from Ms. Bokhour in mid-May. He did not arrange for a check to be sent to him for signature at that time. He waited, instead, for his return to New York and signed a check on Saturday, May 30. He then chose to rely on his assistant to mail it.

Dr. Wilson was informed, on June 1, that TD Capital had not received the payment, but that it would allow additional time (through the close of business on June 2) for the check to arrive. Quite frankly, in light of the potential consequences that news should have spurred Dr. Wilson to take exceptional steps. He ought to have called TD Capital on the morning of June 2 to see if the check had arrived then, and if it had not arrived he should have personally delivered a replacement check, or arranged for someone else to do so. But he did none of those things. Instead of taking careful steps to be sure a check would be received on time, he simply assumed that things would work out, and did not ensure that they did so.

The Court cannot find, under the standards set by the Second Circuit decisions cited above, that this constitutes "excusable neglect." Dr. Wilson was aware of the deadline that he faced, and of the potential consequences of missing the deadline. The Court does not mean any disrespect for Dr. Wilson, but he made a bad decision. The deadline was too close, and the consequences of missing the deadline were too extreme, for him just to assume that things would work out when he told his assistant to mail the check on May 30. The fact that the payment did not arrive on time is not the result of "excusable neglect" as defined by the controlling case law. Accordingly, the motion for relief under Rule 9006 would have to be denied, even if the

deadlines in the Stipulation were to be treated as "court orders" that remained subject to court-authorized exceptions.

*          *          *          *

For the foregoing reasons the Court finds in favor of First Union with regard to the claims that the provisions of the Stipulation that authorized TD Capital to record the deed are unenforceable under New York law, and that the recording of the deed was void and needs to be undone. However, the Court finds in favor of TD Capital with respect to the alternative motion under Rule 9006 seeking additional time for the May payment to be made. The parties are directed to agree on an appropriate form of judgment and order that reflects the foregoing.

Dated:  New York, New York
        August 4, 2017

<u>**s/Michael E. Wiles**</u>
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE